IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 08-00513 JMS |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING |
| | ) | DEFENDANT'S MOTION TO |
| vs. | ) | SUPPRESS |
| | ) | |
| SIMON JASPER McCARTY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS

## I. INTRODUCTION

On August 5, 2008, Defendant Simon Jasper McCarty ("Defendant"),

a United Kingdom national, was traveling from Hilo to Honolulu when the

Transportation Security Administration ("TSA") found photographs of naked

prepubescent children in his luggage.  As a result of this discovery and a

subsequent investigation, the Second Superceding Indictment ("SSI") charges

Defendant with 10 counts of child pornography, including: two counts of

knowingly transporting child pornography in interstate commerce on July 28, 2008

in violation of 18 U.S.C. §§ 2252A(a)(1) and (b)(1) (counts 1 and 2), two counts of

knowingly possessing child pornography on August 5, 2008 in violation of 18

U.S.C. §§ 2252(a)(5)(B) and (b)(2) (counts 3 and 4); and five counts of coercing a

minor to engage in sexually explicit conduct for the purpose of producing visual depictions of such conduct in violation of 18 U.S.C. §§ 2251(c)(1)(B) and 2251(e) (counts 5-10).

Currently before the court is Defendant's Motion to Suppress, in which he seeks to suppress all evidence obtained as a result of the August 5, 2008 search of his luggage at the Hilo International Airport. Defendant argues, among other things, that the TSA performed an overbroad search of his luggage and there was no probable cause supporting the arrest. Based on the following, the court GRANTS Defendant's Motion to Suppress.

## II. **BACKGROUND**

### A. **Procedural Background**

On April 13, 2009, Defendant filed his Motion to Suppress. On May 15, 2009, the government filed its Opposition. At a June 3, 2009 hearing before Judge Helen Gillmor, the court continued the hearing until September 15, 2009 after the government disclosed that it had recently learned additional facts regarding the TSA search of Defendant's luggage. On June 23, 2009, Defendant filed a Supplemental Memorandum in support of his Motion to Suppress, and the government filed a Supplemental Opposition on July 7, 2009. On August 25, 2009, this action was assigned to the undersigned.

On September 10, 2009, the court received oral testimony from TSA screener guard Dorina Andrade ("Andrade"), TSA screener guard Jenny Moniz ("Moniz"), TSA lead Tracy Kitamura ("Kitamura"), TSA supervisor Stephanie Kamohai ("Kamohai"), Hilo Airport law enforcement officer Rodney Aurello ("Aurello"), and TSA Deputy Assistant Federal Security Director Patrick Collins ("Collins").   On October 20, 2009, the court received oral testimony from Hawaii County Police Department ("HCPD") Officer Norbert Serrao, HCPD Detective John Ancheta ("Ancheta"), Immigration and Customs Enforcement agent Bruce Law, and Defendant.   On November 3, 2009, the parties filed additional supplemental briefing.

## B.   Factual Background

Based on the testimony and evidence presented,[1] the court provides the following recitation of the relevant events.

### 1.   TSA Search Procedure

The TSA screens all pieces of luggage that go onto a plane to ensure that they do not contain any explosive devices or other items that would threaten the safety of the plane.   *See* Pl.'s Ex. 85 (listing items that are prohibited in carry-

---

[1] At the October 20, 2009 hearing, the court admitted Plaintiff's Exhibits 1-96.  The government also attached an additional exhibit to its November 3 Supplemental Opposition. Because this exhibit was not admitted into evidence, however, the court does not consider it.

on and/or checked luggage).

One method of screening luggage is through an x-ray machine, which can identify potential safety risks and/or dense items in luggage that require further inspection.  Collins testified that when an x-ray machine alarms on an item in a piece of luggage, the TSA employee must find and examine that item to ensure that it is not an explosive device.  If, for example, the alarm is due to a laptop computer in a piece of luggage, the employee must physically remove the laptop computer from the luggage and examine it.  Doc. No. 57, at 146.[2]  As another example, if the dense item alarm is due to what turns out to be a stack of photographs, the employee must "thumb through" or "leaf through" the photographs to ensure that they are not hiding any sheet explosives.  *Id.* at 148.

Sometimes, a TSA search reveals contraband that is not a threat to airplane safety, such as illegal drugs, drug paraphernalia, or large amounts of cash. TSA Operations Directive OD-400-54-2 provides that "[w]hen TSA discovers contraband during the screening process that is not a TSA Prohibited Item, the matter should be referred to the local Law Enforcement Officers as appropriate." Pl.'s Ex. 84.  TSA screeners are not, however, trained to perform investigations; their job is simply to clear the bag for safety concerns.  Doc. No. 57, at 160-61.

---

[2]  Docket Number 57 refers to the official transcript of the September 10, 2009 hearing.

4

Accordingly, if a TSA employee finds an item that is either contraband or what they feel might be contraband, the employee must call a law enforcement officer. *Id.*

### 2. The Search of Defendant's Luggage

On July 28, 2008, Defendant arrived in Hawaii from the United Kingdom.  On August 5, 2008, Defendant traveled to the Hilo International Airport to board a flight to Honolulu and checked two pieces of luggage: (1) a "Travel Pro" brand bag, *see* Pl.'s Ex. 87; and (2) a "Travel Zone" brand bag.  *See* Pl.'s Ex. 88.  These bags went to the TSA screening area where Andrade and Moniz were screening luggage using a CTX 5500 DS security x-ray machine.  Doc. No. 57, at 16-17.  The Travel Zone bag passed the security check, but when the Travel Pro bag was scanned at approximately 10:13 a.m., Andrade received an alarm for a dense item.

Andrade testified that from the image on the x-ray machine, the dense item in the Travel Pro bag appeared to be a laptop computer with a dense mass around it.  *Id.* at 18-21.  Andrade pulled the Travel Pro bag from the x-ray machine and took it to a search table.  *Id.* at 21.  After opening the main compartment and feeling that the computer was in the front pocket, Andrade opened the front pocket and pulled out the laptop computer.  *Id.* at 51-53.  Andrade testified that as she

pulled out the laptop computer, a photograph envelope, Pl.'s Ex. 83, and some of its contents fell out of the bag and onto the table.  *Id.* at 53-54.

The envelope had included, among other things, photographs of nude and partially clothed children, Pl.'s Exs. 1-56, newspaper and magazine clippings describing sexual acts including sex between minors and trial testimony of sexual encounters between a minor boy and woman, *id.* at Exs. 72-75, magazine clippings of children's pajama, underwear, and swimwear advertisements, *id.* at Exs. 59-71, and handwritten notes drafted in the first person describing a man molesting boys and a girl.[3]  *Id.* at 80-81.  Of the 58 photographs from the envelope, 57 are of minor children in various states of undress -- for example, young boys with no shirts on, boys in their underwear only, one shirtless boy laying down while a hand reaches toward his pants, and one boy lying face up on top of Defendant while Defendant lifts up the boy's shirt.

Eleven photographs, however, include child nudity, which are marked as Plaintiff's Exhibits 1-10, and 58.  These photographs include:

1.      Color photograph of two prepubescent boys, appearing to be between the ages of 4 and 6, standing.  One boy, clothed, is helping the other boy pull down his underwear, displaying the boy's penis.  The face of

---

[3] While the handwritten notes do not explicitly identify the individuals being touched as minors, that the notes describe child molestation can be inferred from their content.

the clothed boy is cut off from the nose up, and the face of the other

boy is not visible.

2-3.   Color photographs of two prepubscent boys -- perhaps the same boys

in the first photograph -- standing naked, with both boys' penises

clearly visible.  The photographs are taken from above the boys, such

that the angle of the photographs cut off the boys' full faces.

4-5.   Color photographs of a nude prepubescent boy appearing to be

between the age of 7 to 10, standing beside a stream and covering his

genitals with one hand.  A portion of the boy's pubic area is visible in

both photographs.

6.     Color photograph of the same boy in the same location as Plaintiff's

Exhibits 4-5, but reaching for clothing.  The boy's penis is fully

visible.

7.     Color photograph of a nude boy, appearing to be between the ages of

2 to 3.  The boy is smiling at the camera, with one hand on his hip,

and the other hand leaning against a door frame.

8-9.   Black and white images (either a copy of a photograph or a clipping

from a magazine) of a fully nude girl, appearing to be between the

ages of 3-5, which clearly show her genitals.  In Exhibit 8, the girl is

7

standing in a bathroom.  In Exhibit 9, the girl is smiling and leaning against something.

10.   Color image (possibly a magazine clipping) of a fully nude girl, appearing to be between the ages of 2 to 4, holding a beach toy.  An adult hand is holding the girl's torso from behind.

58.   A black and white image of a fully nude girl, appearing to be between the ages of 3 to 6, who is making a funny face in a mirror.

Andrade was unable to identify what contents of the envelope had fallen out and were initially visible on the table.  When asked by the government what images she recalled seeing on August 5, 2008, Andrade testified that she generally recalled seeing Plaintiff's Exhibits 1, 4, 11, 15-18, 21, 22, 52, 53, 55, 59-61, 72, 73, 80, and 81.  Doc. No. 57, at 26-28.  When specifically asked by Defendant's counsel and the court what images were initially visible -- as opposed to what images she recalled seeing that day -- Andrade identified Plaintiff's Exhibits 2, 3, 15, 21, and 22.  Doc. No. 57, at 58-59.  Upon additional questioning, however, Andrade admitted that she could not identify what images were initially visible and that she simply recalls seeing photographs of nude children.  *Id.* at 60, 63.

Andrade's testimony regarding what occurred after the envelope fell

onto the table was confusing and often contradictory; the court cannot discern what Andrade and Moniz did and the sequence of events.  For example, Andrade testified that she proceeded to inspect and clear the laptop computer and then turned to the envelope and what had fallen out.  *Id.* at 22.  In contrast, Moniz testified that she came to assist Andrade immediately after Andrade opened the Travel Pro bag and that the two of them started picking up what had fallen out of the envelope.  *Id.* at 125-26, 129.  As another example, at one point Andrade testified that nobody touched either the envelope or the contents that had fallen out before calling her "lead," other TSA employees, or a law enforcement officer ("LEO"), *id.* at 71-73, but later testified that she reviewed the contents of the envelope and what had fallen out of it before she requested assistance from her "lead," Kitamura.  *Id.* at 73-74.

Despite these inconsistencies, the testimony established that Andrade and Moniz did inspect the materials.  Again, however, the court cannot discern precisely what they inspected or when they inspected certain items.  Moniz' testimony differs from Andrade's testimony, and Andrade's testimony is contradictory on several material points.  Moniz testified that she assisted Andrade to collect the photographs that had fallen out of the envelope "[a]nd at that point we saw something that was improper, we did look through the rest of them, and

then we stopped." *Id.* at 131.[4]  Moniz further testified that she read parts of a news

article and Defendant's notes, and showed Andrade the advertisements of

children's underwear.  *Id.* at 131-32.

Andrade, however, provided inconsistent versions of events.  Andrade

testified that she became alarmed immediately when she first saw the photographs,

*id.* at 30, 75, but also testified that she did not believe anything was wrong when

she first saw them.  *Id.* at 63.  Regarding what had fallen out of the envelope,

Andrade testified at one point that she did not touch those items and searched only

the envelope, *id.* at 87, but also testified that she went through some of the

photographs on the table because she "felt that the children were in a harmful way"

and "needed to see more before I called my lead."  *Id.* at 61-62.  Regarding what

remained in the envelope, Andrade first testified that she had to review its entire

contents because she believed that they were part of the dense mass on which the

x-ray machine alarmed and protocol requires her to visually inspect each item in

the envelope.  *Id.* at 69.  She later testified, however, that she was not reviewing

---

[4]  Similar to Andrade, Moniz recalls seeing newspaper clippings and photographs on the table.  Moniz could not recall which photographs were initially visible, but recalled seeing photographs of nude children and others in which the children looked uncomfortable, upset, and/or unhappy.  Doc. No. 57, at 130.  Although not sure at what point she saw them, Moniz recalled seeing photographs that included (1) a boy with no shirt on laying on a bed in a stiff position squinting his eyes shut; (2) a two or three year old nude child; and (3) a nude child by a rock near a pond.  *Id.* at 140-41.

the contents for safety purposes but rather out of concern for the children, *id.* at 81-83, and in any event did not review the entire contents of the envelope. *Id.* at 98. Andrade further testified that she read portions of the articles and handwritten notes and that she came to the conclusion that something was wrong based on everything combined together. *Id.* at 76-77.

At some point, Andrade alerted Kitamura, who briefly inspected the photographs and noticed the photographs of nude children.[5] Kitamura then contacted Kamohai. When Kamohai arrived, the contents of the envelope that had fallen out were in a single pile on the table so that only the photograph on top was visible. *Id.* at 185. Kamohai shuffled through the pile, read 3 or 4 lines of one of the handwritten notes, and also reviewed the contents that remained in the envelope. *Id.* at 188-90. Based on her review of the items, Kamohai decided to call an LEO. *Id.* at 196-97.

Shortly thereafter, Aurello arrived at the screening area, thumbed through some of the photographs on the table, and decided to call HCPD. *Id.* at 164-66. At 10:39 a.m., HCPD officers Eric Reyes and Norbert Serrao arrived at the TSA screening area. Serrao was handed the envelope -- which now held all of the materials -- and reviewed them for approximately 2-3 minutes. Based on his

---

[5] Kitamura could not recall any specific photographs that he saw. Doc. No. 57, at 177.

review, Serrao decided to arrest Defendant for violation of Hawaii Revised Statutes ("HRS") § 707-752, promotion of child abuse in the third degree.

### 3.    Defendant's Interview

At approximately 1:52 p.m., HCPD Detective Ancheta interviewed Defendant at the Hilo police station.

After asking Defendant some preliminary questions (e.g., his name, birth date, address, etc.), Ancheta explained that based on his discussions with other officers, he believed that they had enough evidence to arrest Defendant for possessing child pornography.  Ancheta explained, however, that he would like Defendant to allow them to search his bags to verify what the officers saw and "go from there."  Pl.'s Ex. 92 at 27-28.  Ancheta then provided Defendant HCPD's "Advice of Search and Seizure Rights and Consent to Search" form and read out loud the portion of it which provides that "[y]ou have a constitutional right not to have a search made of your premises, vehicle, property without a search warrant and to refuse consent of such search without a warrant."  *Id.* at 28.  After discussing Defendants' options and the fact that Defendant wanted to continue on to Honolulu, Ancheta filled out the form for consent with Defendant, which Defendant initialed and signed.   *Id.* at 30; Pl.'s Exs. 94, 95.

At approximately 2:05 p.m., Detective Ancheta provided Defendant

HCPD's "Advice of Rights" form and explained that Defendant has the right to remain silent and the right to speak with an attorney.  Pl.'s Ex. 92 at 32. Defendant and Ancheta again discussed Defendant's rights, and they completed the form.  The fully completed Advice of Rights Form shows that Defendant initialed that he understood the rights he was read, that he did not want a lawyer, and that he would like to talk with Detective Ancheta about what happened.[6]  Pl.'s Ex. 93.

## III.  ANALYSIS

Because HCPD arrested Defendant without a warrant, the government has the burden of proving that HCPD had "'probable cause to believe that the suspect has committed or is committing a crime.'"  *Virginia v. Moore*, 128 S. Ct. 1598, 1605 (2008) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979); *see Torres v. City of L. A.*, 548 F.3d 1197, 1206 (9th Cir. 2008); *United States v. George*, 883 F.2d 1407, 1412 (9th Cir. 1989).  Although HCPD arrested Defendant, the parties agree that the HCPD arrest was valid only if the TSA's administrative search of the Defendant's Travel Pro suitcase resulted in probable cause that Defendant violated HRS § 707-752.  Based on the evidence and

---

[6]  At some point during their conversation, Defendant had begun initialing the "yes" column on the form indicating that he did want an attorney, but finally fully initialed the "no" column.  *See* Pl.'s Ex. 93.  In reviewing the form with Detective Ancheta, Defendant further verified that while he put an "S" in the yes column, he initialed "SM" in the "no" column.  Pl.'s Ex. 92 at 32-33.

testimony provided, the court finds that Andrade's search of the Travel Pro bag went beyond the scope of an airport administrative search for weapons and/or explosives and that her vague and contradictory testimony regarding what items she found during her administrative search are insufficient to support probable cause.

**A.      Andrade's Search of the Travel Pro Bag**

Andrade searched Defendant's Travel Pro bag at the airport without a warrant.  The government bears the burden of proving that the warrantless search falls within an exception to the warrant requirement.  *Vale v. Louisiana*, 399 U.S. 30, 34 (1970); *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1295 (9th Cir. 1988).

One such exception is an administrative search -- while "[a] search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing[,] where the risk to public safety is substantial and real, blanket suspicionless searches calibrated to the risk may rank as 'reasonable' . . . ."  *United States v. Aukai*, 497 F.3d 955, 958 (9th Cir. 2007) (en banc) (citation and quotation signals omitted).  Specifically, airport screening searches without a warrant generally "are constitutionally reasonable administrative searches because they are 'conducted as part of a general regulatory scheme in furtherance of an

administrative purpose, namely, to prevent the carrying of weapons or explosives aboard aircraft, and thereby to prevent hijackings.'"  *Id.* at 960 (quoting *United States v. Davis*, 482 F.2d 893, 908 (9th Cir. 1973)); *United States v. Marquez*, 410 F.3d 612, 616 (9th Cir. 2005) ("Airport screenings of passengers and their baggage constitute administrative searches and are subject to the limitations of the Fourth Amendment." (citation omitted)).

"A particular airport security screening search is constitutionally reasonable provided that it 'is no more extensive nor intensive than necessary, in the light of current technology, to detect the presence of weapons or explosives [] [and] that it is confined in good faith to that purpose.'"  *Aukai*, 497 F.3d at 962 (quoting *Davis*, 482 F.2d at 913); *see also Marquez*, 410 F.3d at 616 (stating that an airport screening is reasonable if "(1) it is no more extensive or intensive than necessary, in light of current technology, to detect weapons or explosives; (2) it is confined in good faith to that purpose; and (3) passengers may avoid the search by electing not to fly." (quotation and citation signals omitted)).  A search does not, however, require consent -- "where an airport screening search is otherwise reasonable and conducted pursuant to statutory authority, 49 U.S.C. § 44901, all that is required is the passenger's election to attempt entry into the secured area of an airport." *Aukai*, 497 F.3d at 961 (footnote omitted).

By law, the TSA must search all checked baggage for explosives, *see* 49 U.S.C. § 44901, and the parties do not dispute that the TSA could search Defendant's bags to ensure that they did not pose a safety risk to the plane. Rather, at issue is whether the government has carried its burden of proving that the search of the Travel Pro bag was for the purpose of detecting weapons or explosives and "confined in good faith" to that purpose. *See Aukai*, 497 F.3d at 962.

As an initial matter, the court recognizes that Andrade and the other TSA employees could legally search the Travel Pro bag for explosives and weapons. In fact, it was for precisely this purpose that Andrade began her search -- the x-ray machine had alarmed on the laptop and a dense item and Andrade was trained to clear the bag by identifying the items causing the alarm. The court further recognizes that Andrade's inadvertent discovery of some of the photographs did not itself extend the search beyond its valid purpose -- "[t]he mere fact that a screening procedure ultimately reveals contraband other than weapons or explosives does not render it unreasonable, *post facto*." *Marquez*, 410 F.3d at 617.

The court cannot conclude, however, that the search of the Travel Pro bag was limited to ensuring that it did not pose a safety risk. Rather, the testimony evidences that the TSA employees, at some point, clearly exceeded the scope of

their administrative search and began to search for evidence of child pornography.

And the government has failed to prove that, during the course of the lawful

administrative search, TSA employees discovered evidence supporting a finding of

probable cause that Defendant possessed child pornography.

      As to Andrade, based on her demeanor and testimony provided, the

court easily concludes that she was not credible -- she demonstrated a complete

inability to provide clear, consistent testimony regarding precisely what she did on

August 5, 2008, and provided inconsistent testimony on several material points,[7]

including: (1) whether she inspected the laptop computer first or turned

immediately to the envelope and the photographs, *see* Doc. No. 57, at 22, 125-26,

129; (2) whether she touched or otherwise inspected the envelope and/or the

contents that had fallen out before an LEO was called, *id.* at 71-74; (3) the scope of

her inspection of the photographs that had fallen out of the envelope, *id.* at 61-62,

87; (4) the scope of her inspection of the envelope, *id.* at 69, 98; and (5) her

reasons for inspecting the photographs and envelope.  *Id.* at 69, 81-83.

      What is clear to the court, however, is that at some point during her

inspection Andrade began to review the photographs and the contents of the

---

[7] By finding Andrade not credible, the court does not necessarily suggest that Andrade was lying.  In fact, it appears to the court that Andrade simply could not recall the events of August 5, 2008, resulting in testimony that can best be described as speculative.

envelope not to detect sheet explosives, but rather out of concern for the children

shown in the photographs and to determine if she had found sufficient evidence of

a crime to call upon her lead, Kitamura.  *See id.* at 61-62, 81-83.  Specifically,

Andrade testified that she went through some of the photographs on the table

because she "felt that the children were in a harmful way" and "needed to see more

before I called my lead."  *Id.* at 61-62.  Andrade further explained that she read

portions of the articles and handwritten notes out of concern for the children in the

photographs:

| | | |
|---|---|---|
| Question: | Now as part of your protocol, when you inspect dense objects, is your protocol to read material as well? |
| Answer: | I needed to determine what the pictures were all about. |
| Question: | Okay.  That's what I'm getting at.  It wasn't about safety at that point, it was about the pictures, right? |
| Answer: | Yeah. |
| . . . | |
| Question: | Again, did you have to read the newspapers to determine if there was any safety issue with regard to the airline? |
| Answer: | To the children. |
| Question: | Okay.  So everything was focused on the children at that point? |
| Answer: | Yes, sir. |

*Id.* at 81-82.

Andrade even specifically confirmed that her search changed from

inspecting the Travel Pro bag for safety issues to determining the nature of the

photograph:

> Question:   So at the time that you started to read these
> items and actually go through the envelope,
> it wasn't about the safety of the plane
> anymore, it was about checking to see if
> these nude photographs you saw on the
> table, if there was some problem with those
> nude photographs, is that correct?
> Answer:     Correct.

Doc. No. 57, at 83-84.[8]

      That Andrade's search changed from focusing on whether the Travel

Pro bag posed a safety risk to the plane to determining the nature of the

photographs is further confirmed by the testimony of the other TSA employees.

Moniz testified that she assisted Andrade collect the photographs that had fallen

out of the envelope "[a]nd at that point we saw something that was improper, we

did look through the rest of them, and then we stopped." *Id.* at 131.  During their

inspection Moniz also read parts of a news article and Defendant's notes, and

showed Andrade the advertisements of children's underwear. *Id.* at 132-33.

Kitamura and Kamohai subsequently inspected the photographs as well, with their

---

     [8] Although Andrade later testified that she examined the photographs solely for sheet
explosives, considering all of her testimony and lack of credibility, the court specifically finds
that Andrade searched the photographs in the envelope not for sheet explosives but for evidence
of child pornography.

sole purpose to determine whether to call an LEO.

The court further finds that even if Andrade continued her inspection of the materials both to search for sheet explosives as well as to determine the nature of the photographs -- which the court does not believe was the case -- such dual purpose is improper.  "[A]n unlawful secondary purpose invalidates an otherwise permissible administrative search scheme."  *United States v. Bulacan*, 156 F.3d 963, 969 (9th Cir. 1998) (citing *United States v. $124,570 U.S. Currency*, 873 F.2d 1240, 1247 (9th Cir. 1989)).  *Bulacan* explains that while the scope of a search for weapons and explosives can be coextensive with a search for contraband,

> In both situations . . . the officers carrying out the search have broad discretion in deciding what items to search for and how carefully to search for those items.
> . . . .  Therefore, where officers have broad discretion as to the parameters of the search, the addition of an impermissible motive extends the scope of the search, regardless of whether the items searched could have been subject to a valid administrative search.

*Id.* at 969-70.[9]  Applying these principles, Andrade and Moniz had discretion in

_____

[9]  The court rejects the government's suggestion that *United States v. Bulacan*, 156 F.3d 963 (9th Cir. 1998), supports that the TSA employees performed a proper search because they had no discretion in determining whether to search the photographs for sheet explosives, *see* Pl.'s Nov. 3 Suppl. Opp'n 6-7.  As an initial matter, this case is not one of a "dual purpose," but rather a search that began as an administrative search and changed to an investigative search. Further, to the extent Andrade and Moniz had a dual purpose in inspecting the photographs, the

(continued...)

deciding how closely to look at the photographs and indeed, rather than "leaf"

through them for sheet explosives, inspected them solely to determine whether the

children were in harm's way.  Accordingly, this impermissible motive extended the

search beyond a valid administrative search.  *See also United States v. $124,570*

*U.S. Currency*, 873 F.2d 1240, 1247 (9th Cir. 1989) (finding that a search of a bag

that had alarmed on a dense mass was overbroad where employees were given

financial incentive to report passengers who were traveling with large amounts of

money).

Despite the testimony indicating that the TSA employees searched the

photographs solely to determine if any children were in harm's way, the

government argues that the search was nonetheless proper because Andrade was

required to inspect the photographs for sheet explosives.  Pl.'s Nov. 3 Suppl.

Opp'n 2-6.  The court readily accepts that a packet of photographs may cause a

---

[9](...continued)
court recognizes that *United States v. Bowhay*, 992 F.2d 229 (9th Cir. 1993), holds that the
presence of an investigatory motive does not invalidate an inventory search where the inventory
policy permits a search of everything.  *See Bulacan*, 156 F.3d at 971 (discussing *Bowhay*).
*Bulacan* distinguishes the search in *Bowhay* from one in which the scope of a search can vary
depending on subjective motivation.  *Id.*  In this case, Collins testified that a TSA employee
simply needed to "leaf through" the photographs to ensure that they did not include sheet
explosives.  Doc. No. 57, at 148.  Andrade and Moniz, however, used their discretion in
determining how closely to inspect the photographs and indeed, did not merely leaf through the
photographs (or even view them looking for sheet explosives) but instead inspected them for
their content.  Accordingly, to the extent Andrade and Moniz had a "dual purpose" in searching
the Travel Pro bag, the analysis of *Bulacan* applies to these facts.

dense item alarm and TSA protocol requires the TSA employee to ensure that the photographs do not include any sheet explosives.  The testimony, however, does not establish that Andrade and Moniz examined the photographs for sheet explosives -- rather, after they noticed the photographs that were initially visible, they inspected the *content* of additional photographs for the purpose of determining their criminal nature.  Further, that this inspection was not an administrative search for explosives is confirmed by the fact that Moniz and Andrade did not actually thumb through all of the photographs -- if they were indeed searching the photographs for sheet explosives, protocol requires that they actually leaf through all of them.  *See id.* at 148, 151.  Rather, as described above, at some point during the search, they began to review the photographs not as part of an administrative search but rather to determine whether children were in harm's way.

The government also argues that the entire contents of the envelope were in "plain view" such that the TSA's review of them did not invade Defendant's privacy.  Pl.'s Nov. 3 Suppl. Opp'n 8-11.  The "plain view" doctrine is limited "to situations where the officer had a legal right to be at the location from which the object was plainly viewed."  *Bulacan*, 156 F.3d at 968 (citing *Horton v. California*, 496 U.S. 128, 136 (1990)).  "[T]o justify the seizure, the incriminating nature of the object must be immediately apparent and the officer must 'have a

lawful right of access to the object itself.'" *Id.* (quoting *Horton*, 496 U.S. at 137).

In this case, the government has failed to establish that the incriminating nature of

the envelope and its contents was immediately apparent.  Andrade could not

identify what images she initially saw, and testified that she (1) did not believe

anything was wrong when she first saw them; Doc. No. 57, at 63; (2) reviewed

additional photographs because she "felt that the children were in a harmful way"

and "needed to see more before I called my lead;" *id.* at 61-62; and (3) came to the

conclusion that something was wrong based on reviewing everything combined

together.  *Id.* at 76-77.  Accordingly, the plain view doctrine does not apply.

Finally, the government argues that the court should be guided by

"practical considerations" in assessing TSA's and HCPD's actions.   Pl.'s Nov. 3

Suppl. Opp'n 11-12.  Even if relevant in this case, "practical considerations" do

not alter the facts -- Andrade and Moniz's review of the contents of the envelope

was not limited to a proper administrative purpose, resulting in a violation of

Defendant's Fourth Amendment rights.  This is not a case where TSA employees

found potentially incriminating photographs and simply continued on with their

administrative search to clear the bag for airplane safety.  Rather, the court

concludes that Andrade and Moniz decided to conduct their own investigation in

violation of Defendant's Fourth Amendment rights.  In sum, based on the evidence

and testimony provided, the court finds that the government did not carry its burden that the search of the Travel Pro bag complied with the Fourth Amendment.

## B.      Probable Cause to Arrest Defendant

The court's inquiry does not end upon finding that the government has not carried its burden of establishing that the TSA search of the Travel Pro bag stayed within the scope of a lawful administrative search.  If the TSA found materials that would support probable cause to arrest Defendant for promotion of child abuse in the third degree in violation of HRS § 707-752 during its administrative search (as opposed to during an overbroad investigation into the criminal nature of the photographs), then Defendant's arrest may nonetheless be lawful.  Based on the following, the court finds that the government has not carried its burden on this issue either.

The court cannot determine from either Andrade or Moniz' testimony what materials they saw during the course of a lawful administrative search. Andrade provided conflicting testimony regarding what photographs she initially saw and eventually admitted that she could not identify what images were initially visible.  Doc. No. 57, at 60, 63.  Given her inconsistent answers regarding what photographs she recalled seeing and complete lack of credible testimony, the court cannot determine at what point during her inspection Andrade may have seen

photographs constituting child pornography.

Similar to Andrade's testimony, Moniz was unable to provide any testimony regarding what images she saw during a lawful administrative search. Moniz could not recall which photographs were initially visible when the envelope fell out of the Travel Pro bag, and only generally recalled seeing photographs of nude children and others in which the children looked uncomfortable, upset, and/or unhappy. Doc. No. 57, at 130. While Moniz did recall seeing certain photographs -- including (1) a boy with no shirt laying on a bed in a stiff position squinting his eyes shut; (2) a two or three year old nude child; and (3) a nude child by a rock near a pond -- she could not determine when she saw them, *id.* at 140-41, and she admitted that after seeing something generally improper, she and Andrade then looked through the rest of the photographs. *Id.* at 131. Given that Moniz admitted that they looked through the photographs and read the materials after seeing some initial photographs she believed were improper, Moniz' testimony does not answer the question of what images they saw during a lawful administrative search.

Further, even if the court credits Andrade's testimony that she initially saw photographs of nude children (which the court does not),[10] this testimony, on

---

[10]  The government suggests that Moniz also testified that she initially saw images of nude children, but Moniz' testimony is not so clear. In response to the question regarding what images she initially saw, Moniz responded "I can't recall the very first photo. I know I saw

(continued...)

its own, does not establish probable cause to arrest Defendant.  Specifically,

without knowing which photographs of nude children Andrade saw, the probable

cause determination cannot be supported unless all of these photographs constitute

child pornography -- if only some of the photographs of nude children are child

pornography, the court has no way of knowing whether Andrade initially saw those

photographs as opposed to the photographs that are not child pornography.  Based

upon the court's analysis, not all of the photographs of nude children are child

pornography.

> "Child pornography" under HRS § 707-752 is defined as:
>
>> any pornographic visual representation, including any
>> photograph, film, video, picture, or computer or
>> computer-generated image or picture, whether made or
>> produced by electronic, mechanical, or other means, of
>> sexual conduct, if:
>>> (a) The pornographic production of the visual
>>> representation involves the use of a minor
>>> engaging in sexual conduct; or
>>> (b) The pornographic visual representation has
>>> been created, adapted, or modified to appear that
>>> an identifiable minor is engaging in sexual
>>> conduct.

"Sexual conduct" includes, among other things, "lascivious exhibition of the

---

[10](...continued)
several photos, and I can describe them to be children that looked uncomfortable, upset,
unhappy.  Like they were in harm's way."  Doc. No. 57, at 130.  She then clarified that she saw
"faces and I seen children that were nude," *id.*, but from this response it is unclear whether she is
referring to photographs she initially saw or those she saw throughout her review.

genital or pubic area of a minor." HRS § 707-752. "'Lascivious' means tending to incite lust, to deprave the morals with respect to sexual relations, or to produce voluptuous or lewd emotions in the average person, applying contemporary community standards." *Id.*

While the court could find no Hawaii cases discussing how to determine whether an image is lascivious, the court finds helpful the factors the Ninth Circuit often looks to in determining whether a particular visual depiction of a minor constitutes a "lascivious exhibition of the genitals or pubic area" in violation of federal law. These factors include:

> 1) whether the focal point of the visual depiction is on the child's genitalia or pubic area;
> 2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity;
> 3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;
> 4) whether the child is fully or partially clothed, or nude;
> 5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity; and
> 6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

*United States v. Overton*, 573 F.3d 679, 686 (9th Cir. 2009) (quoting *United States v. Dost*, 636 F. Supp. 828, 832 (S.D. Cal. 1986), *aff'd sub nom. United States v. Wiegand*, 812 F.2d 1239 (9th Cir. 1987)). These "*Dost*" factors, as they are called, are "merely 'a starting point' for determining whether a particular image is 'so

presented by the photographer as to arouse or satisfy the sexual cravings of a voyeur.'"   *Id.* (quoting *United States v. Hill*, 459 F.3d 966, 972 (9th Cir. 2006)).

Plaintiff's Exhibits 1-10 at 58 were found in Defendant's Travel Pro bag and depict nude children.  Applying the *Dost* factors, the court finds that at least Plaintiff's Exhibits 7, 10, and 58 are not child pornography.  Exhibit 7 is a color photograph of a nude boy, apparently between the ages of 2 to 3.  The boy is smiling at the camera, with one hand on his hip, and the other leaning against a door frame.  The setting of the photograph is not sexually suggestive and the child's pose, while jaunty, is not unnatural or suggestive.  Given its content, this image does not appear to be intended to elicit a sexual response from the viewer.[11] Exhibit 10 is a color image, possibly a magazine clipping, of a fully nude girl, apparently between the ages of 2 to 4, holding a beach toy.  The setting of the photograph -- a beach or pool with others present -- is clearly not sexually suggestive; the child is not in an unnatural pose, and the photograph does not suggest a willingness to engage in sexual activity.  Finally, Exhibit 58 is a black and white image of a fully nude girl, apparently between the ages of 3 to 6, making a funny face in a mirror.   The focal point of the image is on the child's face as

---

[11]   The government argues that the final *Dost* factor requires the court to determine the intended impact of the pedophile viewer as opposed to an average healthy viewer.  *See* Pl.'s Nov. 3 Suppl. Opp'n 17.  The court disagrees -- the final *Dost* factor is not so sharply defined, and indeed would support a finding of child pornography in almost all cases.

opposed to her genitalia, the setting is not sexually suggestive, the child is not in an

unnatural pose and does not suggest sexual coyness, and the visual depiction does

not appear intended to elicit a sexual response in the viewer.[12]

In sum, because the court cannot determine what photographs

Andrade and Moniz may have seen during their administrative search, the

government has failed to carry its burden that the TSA properly uncovered

photographs that would support probable cause to arrest Defendant.

## C.      Whether Suppression Is Appropriate

The court must now determine whether, based on the facts and

conclusions described above, suppression of the evidence is warranted.  The

government argues against suppression on the basis that (1) pursuant to *Herring v.*

*United States*, 129 S. Ct. 695 (2009), there was no flagrant violation of

Defendant's rights; and (2) Defendant's voluntary consent to a search of his

---

[12]  In opposition, the government argues that the court should consider the other
photographs in Defendant's possession as well as the evidence that Defendant likely had a role
in creating the photographs, all indicating that these photographs were lascivious.  *See* Pl.'s Nov.
3 Suppl. Opp'n 18-19.  The problem with the government's argument is that it incorrectly
assumes that Andrade and Moniz were aware of these facts.

The court also recognizes it is unclear whether possession of child erotica alone can ever
be enough to establish probable cause that an individual possesses child pornography, *see United
States v. Hansel*, 524 F.3d 841, 846 n.3 (8th Cir. 2008), but nonetheless the court should
consider the totality of the circumstances.  *See United States v. Overton*, 573 F.3d 679, 686-87
(9th Cir. 2009).  In this case, the only evidence is the photographs themselves and given that
some of the pictures may not even qualify as child erotica, the court rejects that the
circumstances in this action would support probable cause if Andrade viewed Plaintiff's Exhibits
7, 10, or 58.

luggage was not tainted by any illegal search.  The court addresses each of these arguments in turn.

### 1.   *Herring v. United States*

Given that *Herring* was decided in January 2009, the reach of its holding has yet to be fully tested.  In *Herring*, the defendant was stopped by police officers who were informed by a dispatcher that a database revealed an outstanding warrant for his arrest.  The police officers uncovered methamphetamine and a firearm, but were later notified that the warrant had actually been recalled and remained in the database due to a system error.  *Herring* found that suppression under these facts was not appropriate because the conduct at issue was not "so objectively culpable as to require exclusion."  *Herring*, 129 S. Ct. at 703.

In so holding, *Herring* goes beyond the facts presented and expounds on the purpose and application of the exclusionary rule.  Specifically, *Herring* affirms the general principle that "suppression is not an automatic consequence of a Fourth Amendment violation."  *Id.* at 698.  "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."  *Id.* at 702.  The exclusionary rule applies "to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or

systemic negligence," as opposed to "nonrecurring and attenuated negligence." *Id.*

*Herring* further outlines that in determining the culpability of the conduct involved, the court "must consider the actions of all the police officers involved." *Id.* at 699 (quoting *United States v. Leon*, 468 U.S. 897, 923 n.24 (1984)).  This analysis is "objective, not an inquiry into the subjective awareness of arresting officers." *Id.* at 703 (quotations omitted).  In other words, the "'good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" *Id.* (quoting *Leon*, 468 U.S. at 922).

The court is hesitant to simply apply a *Herring* analysis to all Fourth Amendment violations.  Certainly, the facts presented in this action -- an overbroad warrantless TSA search uncovering evidence of child pornography which is then turned over to the police -- are very different than the clerical error of *Herring*. The court is aware, however, that *Herring* may apply at least to some Fourth Amendment violations stemming from warrantless searches.  *See United States v. Monghur*, 576 F.3d 1008, 1013-14 (9th Cir. 2009) (finding that a warrantless search violated the defendant's Fourth Amendment rights and remanding to district court to determine whether suppression is warranted).  Accordingly, assuming the *Herring* framework does apply, the court determines whether exclusion is

31

nonetheless warranted.

Under the facts presented, the court has little difficulty finding that the conduct at issue is sufficiently deliberate and culpable such that exclusion will meaningfully deter it and is worth the price paid.  Specifically, the Fourth Amendment violation by the TSA employees was both deliberate and culpable. Their administrative search of Defendant's Travel Pro bag was required to be "no more extensive nor intensive than necessary, in the light of current technology, to detect the presence of weapons or explosives [] [and] confined in good faith to that purpose.'"  *Aukai*, 497 F.3d at 962 (quoting *Davis*, 482 F.2d at 913).  As described above, however, Andrade and Moniz did not confine their search as required and instead began their own criminal investigation into the nature of the photographs. Compounding this violation is that the TSA employees are not given any training regarding investigations and are instead trained to contact an LEO if they find contraband or anything they believe might be contraband.  *See* Doc. No. 57 at 159-60.  Simply put, based on the evidence presented the court concludes that Andrade and Moniz deliberately went beyond the clearly defined lines of a permissible administrative search.  While the price of exclusion to the justice system is high, it does not outweigh the need to deter similar conduct in the future.  The court therefor finds that suppression is proper.

### 2.     *Defendant's Consent*

The government argues that the lack of probable cause to arrest

Defendant does not warrant suppression because Defendant provided voluntary

consent to search his luggage.  Pl.'s Nov. 3 Suppl. Memo 25-28.  "It is well

established that, under the 'fruits of the poisonous tree' doctrine, evidence obtained

subsequent to a violation of the Fourth Amendment is tainted by the illegality and

is inadmissible, despite a person's voluntary consent, unless the evidence obtained

was 'purged of the primary taint.'" *United States v. Washington*, 490 F.3d 765, 774

(9th Cir. 2007) (citing *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).

"The test for admissibility of the evidence is two-fold:   not only must the consent

be voluntary, but it must also be 'sufficiently an act of free will to purge the

primary taint.'"  *Id.* (quoting *Wong Sun*, 371 U.S. at 486).

Assuming that Defendant's consent was voluntary,[13] the court finds

that the government has not carried its burden of establishing that the consent was

"gained through 'means sufficiently distinguishable to be purged of the primary

taint'" of the Fourth Amendment violation.  *See id.* at 776 (quoting *Wong Sun*, 371

U.S. at 488).  In determining whether consent is purged of the taint, the court must

---

[13]  Because the court finds that the consent to search was not "purged of the primary taint," the court does not determine and expresses no opinion regarding whether the consent to search was voluntary.

33

consider: "(1) 'the temporal proximity' of the consent and the illegal seizure;

(2) 'the presence of intervening circumstances'; and (3) 'particularly, the purpose

and flagrancy of the official misconduct.'" *Id.* at 776-77 (quoting *Brown v.*

*Illinois*, 422 U.S. 590, 603-04 (1975)). Further, whether *Miranda* warnings were

given may be relevant. *See id.* at 777 n.10 (explaining that *Brown*, involving a

confession after an illegal arrest, considered this factor).

First, the temporal proximity between the violations of Defendant's

Fourth Amendment rights and the consent was only a few hours -- the TSA

searched Defendant's bag at approximately 10:15 a.m. and HCPD arrested

Defendant shortly thereafter, while Defendant gave HCPD consent to search his

luggage at approximately 2:00 p.m. This factor weighs in favor of suppression.

*See Taylor v. Alabama*, 457 U.S. 687, 691 (1982) (finding six hours insufficient);

*United States v. Perez-Esparza*, 609 F.2d 1284, 1290 (9th Cir. 1979) (finding three

hours insufficient); *see also United States v. George*, 883 F.2d 1407, 1416 (9th Cir.

1989) ("As best we are aware, no court has weighed the first factor against a

defendant when his inculpatory statement followed illegal police conduct by only a

few hours.").

Second, there are no intervening circumstances between Defendant's

illegal arrest and his consent. "Examples [of intervening circumstances] include

release from custody, an appearance before a magistrate, or consultation with an attorney, 'such that we would be able to say that [a defendant's] consent to search was an "unconstrained, independent decision" that was completely unrelated to [the] initial unlawful' violation." *United States v. Washington*, 387 F.3d 1060, 1074 (9th Cir. 2004) (quoting *George*, 883 F.2d at 1416).   While the government suggests that Defendant's signing the permission to search form is a sufficient intervening event, *see* Pl.'s Suppl. Nov. 3 Opp'n 27, the Ninth Circuit has soundly rejected that written consent qualifies as an intervening event.   *See Washington*, 387 F.3d at 1074.   The court also finds relevant that Defendant was not given his *Miranda* rights prior to Ancheta seeking consent.   Accordingly, this factor weighs strongly in favor of suppression.

Finally, while HCPD's conduct may not have been outrageous or misleading, such fact on its own is not sufficient to purge the taint, s*ee United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1300 (9th Cir. 1988), and the misconduct by the TSA was both deliberate and culpable.   Further, Defendant was impermissibly seized, which weighs in favor of suppression.   *See Washington*, 490 F.3d at 777.   Accordingly, considering all these factors, the court finds that the government has not carried its burden of establishing that the consent was purged of the primary taint of the Fourth Amendment violation.

35

In sum, the court finds that the evidence against Defendant must be suppressed.

## IV.  <u>CONCLUSION</u>

Based on the above, the court GRANTS Defendant's Motion to Suppress.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, November 16, 2009.



   <u>/s/ J. Michael Seabright</u>   
J. Michael Seabright
United States District Judge

*United States v. McCarty*, Cr. No. 08-00513 JMS, Order Granting Defendant's Motion to Suppress